## BERTRAM v. EXCHANGE TRUST CO.
### No. 5113.

District Court, D. Massachusetts.
Aug. 15, 1933.

Joseph Wentworth (of Choate, Hall & Stewart), of Boston, Mass., for plaintiff.

Charles C. Barton (of Barton & Harding), of Boston, Mass., for defendant.

LETTS, District Judge.

This is an action for damages predicated upon the alleged conversion of 20,000 shares of stock in the Victory Gold Mines, Limited, an Ontario corporation. The defendant trust company was the transfer agent of that corporation, a fact of considerable significance in determining the defendant's duty, and its ability to discharge that duty, under the rather disordered and confused dealings which underlie this action.

Under date of March 30, 1928, the defendant entered into an escrow agreement with the Assets & Securities, Limited, of Ontario, Canada. Under this agreement, certificates representing 799,993 shares in the Victory Gold Mines, Limited, were deposited with the defendant trust company. These shares were to be held in escrow until March 30, 1929, unless one Jarvis should default in his payments under a separate agreement which contemplated the purchase by Jarvis of 200,000 shares of this mining corporation. Apparently, the purpose, in part at least, was to take, by the deposit in escrow, a large block of stock off the market to facilitate some operation by Jarvis in relation to the 200,000 shares which he was buying. The escrow agreement provided that, in event of default by Jarvis, or, if there be no default, then forthwith after March 30, 1929, the escrow shares should be forwarded to Assets & Securities, Limited, at Toronto. This agreement was clear, simple, and defendant's limited duties plainly apparent.

The waters, however, are soon muddied. Under date of November 26, 1928, which was about eight months after the escrow agreement was entered into, Assets & Securities

sold, with the consent of Jarvis, 750,000 of the escrow shares to one McGovern, thereby reducing the res in escrow to 49,993 shares. The plaintiff's claim relates to the alleged wrongful withholding from him of 20,000 shares of this residue of the escrow. The plaintiff appears upon the scene in the following manner: Under date of November 27, 1928, Assets & Securities, Limited, advised the trust company as follows: "From and out of the Certificate of Shares standing in the name of G. S. Adams, or from any other Certificate of the above Company now in Escrow in your possession, this will be your full and complete authority upon the dissolution of the present existing pool and not later than the 15th day of May, 1929, to deliver to George F. McNaughton or his Nominee, 20,000 of the shares of the above Company now held in Escrow by you." This letter to the defendant was forwarded by McNaughton under a brief covering letter of the same date, requesting the acknowledgment thereof by the trust company. This acknowledgment appears to have been made by the trust company direct to Assets & Securities, Limited, under date of November 30, 1928. The pertinent part of this acknowledgment is the following paragraph: "We also acknowledge receipt of your letter of November 27th authorizing us, at the termination of the existing pool, no later than May 15th, 1929, to deliver to George F. McNaughton or his nominee, 20,000 shares of the Victory Gold Mines Company, Limited, held by us in escrow."

Under date of February 5, 1929, McNaughton, in turn, executed a similar assignment of his 20,000 shares of the escrow deposit to one McKeely. Plff's Ex. 10. This instrument was, as before, sent to the trust company accompanied by a covering letter of the assignee dated March 28, 1929, embodying instructions in regard to the issuance and delivery of certificates representing the said number of shares.

Under date of April 2, 1929, the trust company acknowledged to McKeely the receipt of his communication and advised him that the escrow stock had been placed under an attachment by W. L. Jarvis, referred McKeely to Jarvis' Boston attorneys, and concluded with the following sentence: "Therefore we cannot make the delivery of the stock until the attachment is released." No other reason for declining to make delivery was advanced.

Six days later McKeely wrote the defendant trust company as follows: "I have this day disposed of my 20,000 shares of the Capital Stock of Victory Gold Mines, Limited, to Charles D. Bertram, and this will be your full and complete authority to deliver to C. D. Bertram or his Nominee, the before mentioned 20,000 shares." This letter, when forwarded to the defendant on April 9, was also accompanied by a communication from Toronto attorneys representing the assignee Bertram, the plaintiff in this case. In this letter the trust company is requested to forward forthwith a certificate issued in the name of Bertram covering 20,000 shares assigned by McKeely, as well as an additional 5,000 shares, which was referred to as having previously stood in Bertram's name. The receipt of these communications was acknowledged in a letter to Bertram's attorneys under date of April 11, in which acknowledgment the trust company refers them to the Boston attorneys for Mr. Jarvis, and refers to the attachment as "making it impossible for us to make delivery." No other reason was advanced for defendant's refusal to deliver.

During the course of the hearing in this matter it was stipulated by counsel that the purported attachment under the laws of Massachusetts was without any legal effect so far as constituting a legal reason or justification for the refusal to make delivery of the shares in question.

■ It would seem clear that the interest in the escrow deposit to 20,000 shares represented a right capable of assignment: First, from the Assets & Securities, Limited, the original depositor, to McNaughton; then from McNaughton to McKeely and from McKeely to Bertram. It is clear, too, that, upon the expiration of the date fixed in the escrow agreement, namely, March 30, 1929, the trust company did not endeavor to return forthwith the remaining shares held to Assets & Securities, Limited, as provided in the escrow agreement.

Following some conferences or negotiations with Boston attorneys employed by the plaintiff, but without any additional documentary evidence of ownership or right in the plaintiff, certificates representing 20,000 shares were delivered on July 8, 1929, and accepted on behalf of the plaintiff, "with all rights reserved to proceed against any parties responsible for loss to Bertram because of delay in furnishing him the certificates for said stock."

■ This case would present no great difficulty if in the beginning certificates representing the escrow deposit had all been properly indorsed in blank or accompanied by

properly executed blank powers for transfer. It would then seem clear that the defendant trust company, if it continued in possession of the escrow deposit for more than a reasonable time following the date of the expiration of the agreement, could not, being the authorized transfer agent of the corporation, ignore authentic assignments by holders of rights to these shares and refuse to transfer and deliver them. The time would have passed when the trust company could take the position that it had no obligation or duty other than to return the shares to the original depositor. Under these circumstances, the refusal of the trust company, in its combined capacity of transfer agent and possessor or bailee of the certificates evidencing the shares, would, in my opinion, amount to a conversion and render the defendant accountable in damages. Handy v. Miner, 258 Mass. 53, 154 N. E. 557, 560. In that case the court said: "It is settled law in this commonwealth that a business corporation has a duty imposed on it by law to issue new certificates of its stock to persons entitled to have such certificates upon the transfer or offer to transfer the old certificates to the corporation; and that an implied promise arises from such duty, for the performance of which an action will lie for the benefit of the holder of shares or for the benefit of his assignee, the action to be brought in the name of the assignee where the corporation or its officers wrongfully refuse to issue such certificates."

Again, in the case of McAllister v. Kuhn, 96 U. S. 87, the court said at page 89, 24 L. Ed. 615: "In this case, the complainant alleges a wrongful conversion by McAllister to his own use of certain shares of the capital stock of a foreign corporation owned by Kuhn, which were represented by certificates of stock that had come into the possession of McAllister. There can be no doubt that shares of stock in a corporation may be transferred by means of an assignment and delivery of certificates. It is true that a certificate of stock is not the stock itself; but it is documentary evidence of title to stock, and may be used for the purposes of symbolical delivery, as the stock itself is incapable of actual delivery. A blank indorsement of a certificate may be filled up by writing an assignment and power of attorney over the signature indorsed, and in this way an actual transfer of the stock on the books of the corporation may be perfected. A wrongful use of such an indorsed certificate for such a purpose may operate as a conversion of the stock."

I perceive no sound distinction between the duty of a corporation under the circumstances dealt with by the court in Handy v. Miner and the duty and responsibility of the transfer agent with authentic and properly indorsed certificates in its possession. Such a situation does not bar an action for conversion merely because the by-laws of the corporation, as has been stressed in this case, contain a specific provision to the effect that, until the transfer is recorded upon the books of the company, "the transferor shall be deemed the holder of the shares." A literal application of such a provision of the by-laws may be entirely justified as between the corporation and its stockholders in respect to the exercise of voting rights or for the disbursement of dividends, and still be wholly unjustified under circumstances as here presented between a transfer agent of the corporation and an assignee of shares, the possession of the certificates evidencing which is already with the transfer agent.

The principal difficulty in the present controversy arises from the confusion of facts and the disorderly manner in which the several transactions were handled almost from the beginning. Some months after the deposit with the defendant of the original escrow certificates, namely, on November 30, 1928 (Plff's Ex. 6), the defendant writes its escrow depositor calling attention to the fact that a considerable number of the certificates deposited were not accompanied by stock transfer powers, as well as other certificates which, though properly indorsed, were assigned to certain individuals who, in turn, had executed no blank power of transfer. This situation existed in respect to certificates representing something over 160,000 shares of the total deposit. Many of these powers were obtained between the fall of 1928 and the 11th of April, 1929, as of which date demand was made by the plaintiff for his 20,000 shares.

At the time of the trial, the testimony presented by Mr. Benson, in charge of the transfer department of the defendant, was so unsatisfactory and confusing that the court requested counsel for the plaintiff and for the defendant to later make a joint investigation of the facts as to the state of the balance of the certificates held by the defendant as of the time Bertram made his demand. Counsel submitted to the court a joint report which is being treated as a part of the record of this case. This report states that on April 11, 1929, there were still held by the defendant certificates representing 39,992 shares. The defendant, however, held no transfer power

for two certificates, together representing 6,000 shares. For one certificate of 23,992 shares issued in the name of Assets & Securities, Limited, it held a transfer power which read in part as follows: "To transfer 23,992 shares standing in our name under certificate No. B. A. O. 5340 to H. McGovern or his assigns." As the record stood, therefore, in respect to these certificates on the date that the plaintiff made his demand, there were, out of a total of 39,992 shares, 29,992 shares represented by certificates either accompanied by no transfer power or accompanied by a specific power to transfer to McGovern with no blank indorsement by·him. In other words, on April 11 the defendant company could have properly discharged its duties as transfer agent and issued but 10,000 shares to the plaintiff. It has been urged that this indorsement to McGovern was an error, and that it was later so treated by the defendant. The fact remains, however, that the certificate was not in proper form to justify a transfer agent in issuing shares therefrom until the error was corrected, if error it was.

■ In view of the fact that Bertram's demand was for the delivery to him of 20,000 shares, it is contended that this demand did not amount to one for the issuance or delivery of a lesser number which the defendant was in a position to transfer. It will be borne in mind, however, that in all the correspondence, to which reference has before been made, the excuse presented for nondelivery by the defendant was the existence of the ineffective attachment. At no time did the defendant advise the plaintiff of the insufficiency of the indorsements or powers held by it. At least, no such excuse was given prior to conferences with Bertram's counsel at a much later date.

I am of the opinion that the defendant cannot now interpose the disclosure of such insufficient powers as a defense for its failure to transfer and deliver to Bertram, or to offer so to do, so many shares, as it was in a position to properly transfer and deliver as transfer agent. The insufficiency of the indorsements upon a portion of the escrow certificates held, and as of a time long after the escrow agreement had terminated, was peculiarly within the knowledge of the agents of the trust company. The extended series of communications and transactions, and protracted holding of the balance of the escrow deposit, had quite altered the simple situation and responsibilities originally set up under the first agreement with Assets & Securities, Limited, in March of 1928.

■ The trust company under the circumstances was justified in declining to transfer and deliver to Bertram any shares from the specifically assigned McGovern certificates and from the Crean and Jamieson certificates representing 6,000 shares. In respect to these, there could be no conversion. Pardee v. Nelson, 59 Utah, 497, 205 P. 332, 21 A. L. R. 385. There was, however, a duty to offer to issue and deliver certificates for 10,000 shares, for which certificates in proper order were held.[1] The plaintiff is, therefore, entitled to a judgment for that sum representing the difference between 50 cents a share on 10,000 shares and 26 cents a share, which I find to be the fair market values of the shares on the respective dates of April 11 and July 8, 1929, together with lawful interest on such sum and costs.

---

[1] Shares of stock are without "earmarks." See Christy's The Transfer of Stock, § 4, pp. 12, 13. See, also, Bowers' The Law of Conversion, § 687, and cases cited.